to the proceedings this afternoon. He can hear the arguments and he can ask questions, right, Madam Clerk? He can ask questions, but as one who is a dinosaur, admittedly, I have found technology sometimes does not go the way that it's all planned, but it will be helped if we and you speak real clearly and directly into the microphone, that way we know that Judge Dennis is able to hear on his end as well, and we'll try to likewise do that, but I think it'll otherwise be uneventful. All right, having said that, Mr. Ellis, you're up, or Mr. Coble. May it please the Court and good afternoon, Your Honors. Richard Ellis for Appellant Billy Wayne Coble. This Court has granted COAs on two issues, the unreliable junk science testimony of Dr. Richard Coons and the false and perjured testimony of A.P. Merillat. The state's case against Mr. Coble, who was, at the time of his trial, a 60-year-old in bad health, unbroken 18-year record of perfect behavior in prison. That was his age at the time of the retrial. At the time of the retrial, Your Honor, yes, that's correct. And it really rests on the unreliable and unscientific testimony of Dr. Coons, testimony that the state court, the Court of Criminal Appeals, said should not have been presented to the jury because it was too unreliable, and the false testimony of Mr. Merillat, whose centerpiece story of prison violence was basically perjury. First, I'd like to examine the testimony of Dr. Coons. He testified that Coble would be dangerous at the first trial, Coble's first trial in 1990. He was wrong, and he said the same thing 18 years later. All right, well, cut to the chase, sum on it. You've argued in the initial brief and passionately about the viability of Dr. Coons having testified in the first place, boom-de-boom, he did. Texas Court of Criminal Appeals ruled, agreed that he shouldn't have, but the hell of his harmless error. And so probably for me, your time is better spent not necessarily convincing us of why he shouldn't have testified or all about the science, but getting over the hump that you admittedly know you have to get over in terms of relief, right? I'm not telling you how to argue the case, but you could be down to nothing and still be arguing about whether Dr. Coons should have gotten up there. Yes, thank you, Chief Judge Stewart. Really, it's the prejudice argument, I think, that this Court needs to hear. And we're not arguing, I would preface that by saying we're not arguing that the Court has to overrule barefoot or this is, in all cases, these kind of psychological testimony is unacceptable. We're saying that in this case, it was extremely, it was unique and it was unreliable because the State Court really ignored the prejudice when the CCA ruled on this. They said, for instance, that there's ample other evidence of future dangerousness, which was wrong. This holding was based on a 1964 evaluation by Dr. Hodges, 44 years before the retrial, when Coble was 15 and he's 60 after retrial. A 1967 military medical report of lifelong maladjustment and Coble is still in his teens. Evaluations more than 40 years prior to the retrial tell nothing to the jury about the propensity of a 60-year-old with a history of heart attacks, high blood pressure, hypertension, and a perfect record of adjustment in prison to commit... Did you cross-examine him on all those issues? And you had your own expert, right? Well, at the retrial, Your Honor, there was some cross-examination of this, but as the attorney, Mr. Calhoun, himself admits that he got bogged down and he admits his own ineffectiveness in the cross-examination that was conducted at trial, and that's in the affidavit from Mr. Calhoun, which was presented in the State Courts. But beyond that, there was ample circumstance of pointing out violent acts in Mr. Coble's prior life. All this domestic violence, throwing a baseball bat, breaking plates. I mean, there was other evidence, not when he was 60, but of violent acts in his past and in his background. So are you shoving those all the way back and say, well, at the time this determination made when he's 60, the other matters are irrelevant? No, Your Honor, we're not. We're not saying they're irrelevant, but we are saying that they are 20 years prior to the trial. Nothing happened in the 18, 19 years immediately prior to the retrial. These incidents cannot occur in prison, which is really the question the jury is being asked. Is he going to be violent given a two possibilities? He's not going to have access to women and these other things that he did in 20 years prior to the retrial. Basically, the state and district courts also held that Dr. Coon's testimony was only a small part of the state's case for future dangerousness and was barely mentioned in the final argument, which is not true. Dr. Coon's testified for 65 pages of major witnesses at this trial. Contrary to the director's claims that Coon's was barely mentioned in final argument, and contrary to the state court's holding that he was mentioned only briefly, he was mentioned four times in the prosecutor's final argument. Basically, the other thing that the state courts held that Dr. Coon's testimony was the same as Dr. Hodge's, who was, as I said, 44 years prior to the trial. We cannot say that a person at the age of 15 is the same person that he is at 60, with 18, 19 years of perfect behavior behind him. Dr. Hodge's himself admitted that he would change his diagnosis of sociopath to conduct disorder. There's been many changes in psychiatry since Dr. Hodge's 1964 evaluation. So the Texas courts have ruled that this should not be admitted under the Texas rules of evidence, and I would like to point out that going forward, Dr. Coon's-like testimony should not, I mean, I guess I can't say cannot, but should not again be presented to this court or to any Texas court because the CCA, in this case, ruled that it is unreliable. It should not be seen again. So basically, that's the argument on prejudice. We have here- Well, wasn't there some current information where they showed Dr. Coon's photographs of young girls that were found in his prison cell? Doesn't that show a continuing propensity to be a problem? Judge Clinton, no, it does not because these were not photographs. These were-Mr. Hodge had a lifelong interest in athletic events, including people that were going to be in the Olympics, and he would send these out. He's had a lifelong interest in youth sports events. So what happened- They're not photographs. They're not drawings. They were newspaper-yes, they were newspaper- Real people whose pictures had been taken as photographs and printed in the newspaper. Yes, but-yes, Your Honor, these were innocuous photographs. They were photographs, newspaper photographs of people. They called these photographs from hundreds and hundreds of newspapers that he had in his cell. Of young girls? No, of- Old men? Of athletes, basically athletes, men and women athletes. This is in the record somewhere, but it was called from a huge stack of-he would send these out, men and women photographs of athletes to promote youth sports programs, which he had been involved with before his arrest in this case. So I think it's a red herring to put much emphasis on these newspaper photographs of gymnasts that he was collecting. I would like to point out the unique unreliability here of Dr. Koons, and the director has posited the DeVoe case as an example of where Dr. Koons' testimony-I mean, Dr. Koons' testimony-I'm sorry, this does not involve DeVoe, but I would like to point out that Dr. Koons had not interviewed Kobel since 1990. He lost his notes of that interview. He did not remember the interview, and he had no independent memory of that interview. As a result, he relied entirely upon the documentary materials given to him by the prosecution. His methodology was entirely subjective. He could not cite even one book or article that supported it. He had not published his methodology in a 40-year career, or had not even published anything at all in that career. And worse yet, he had not even read any of the scholarly articles on future dangerousness, nor was he familiar with the most prominent articles on his own purported specialty when they were shown to him by the prosecutor at Kobel's trial. He was not aware of the accuracy of his own methodology, and he never even bothered to check the accuracy of his prior predictions, despite testifying in 50 cases. So this is why we say that Dr. Koons' evaluation here was somewhat unique, and it was 18 years out of date. It considered nothing Kobel had done in the prior 18 years, with the exception of the so-called evil grins that he pointed to, which were less than 18 years old. So basically, we have here, despite testifying that future dangerousness predictions were short and intermediate term, and this is at ROA 11819, the only factors he considered, other than the so-called evil grins, were almost 20 years old. So basically, he tried to explain away Kobel's spotless disciplinary record for the past 18 years with his theory that people on death row are always less of a danger than those serving life sentences. And by that logic, every defendant would merit a death sentence, because it's always the safest place to put someone. Additionally, as a matter of public policy, it's hard to see the state's interest here in de-incentivizing good behavior on death row by arguing at a retrial that it counts for nothing. Unless Kobel's good behavior counts for something, there would be no rationale for people on death row to behave well, as Dr. Koons claimed. I would like to move on to the Marillat claim, if the court has no further questions. The Marillat, to me, Marillat is, you know, probably, well, at any event, I'd just still bring back so I know exactly what you have to say. I mean, you make a persuasive argument about Dr. Koons. The Texas Court of Criminal Appeals agreed and said that his testimony shouldn't have been in there. But then they go through the entire record to determine homelessness, and they notwithstanding that Dr. Koons' testimony wasn't reliable, but nonetheless, the relief your client asked for was not granted. We've got the case up here under Aetna. My question is, are you, and moreover, I'm still not sure you seem not to be giving a lot of stock to your expert, Dr. Cunningham, who Judge Clement asked you, did you cross-examine Dr. Koons? Is it your view that, putting aside Dr. Cunningham's testimony, which was favorable to your client, the Texas Court of Criminal Appeals did not adjudicate this claim such that we have to apply the Aetna deferential standard? I mean, you're arguing it to us as if we've got it as a brand new issue. Yes, yes, Chief Judge Stewart. Excuse me, there is a 2254 D2 problem in that state court got the facts wrong. The factors that they used to find it harmless, and I would respectfully urge the court to review the record that we've made, the briefs that we've made, where we've discussed that in detail. Well, I understand, but that's why I stopped you. You're ready to go to this investigator, which to me is not on the plane of Dr. Koons. I don't want you to relegate me to the record. We're going to look at it. We've read your oral argument. I want you to tell us how, on the standard we have a review, how you're going to get relief from your client, not send us to the record and then go talk about the investigator to simply say he shouldn't have testified. Well, the answer, Chief Judge Stewart, to your question is that the prejudice, the reasons that they held it to be harmless error were basically based because they ignored the prejudice here on the factors that I tried to go through here. There was no ample other evidence of future dangerousness. That was the basis that they held it to be harmless on, and the other evidence of future dangerousness was, as I said, 30, 40 years old. Another reason they used is that they said that Dr. Koons's opinion was not particularly certain or strong because he answered just to a hypothetical, but that too is wrong. He answered much more than just to the hypothetical. He testified that Kobol's violence had escalated, that he did it out of revenge, that he needed to control his wives. He cited the evil grin, and he said that everybody else on death row was on appeal, so they had an incentive to behave. The state courts were wrong when they said it was only a small part of the state's case for future dangerousness, 65 pages of transcript. The state court was wrong when they said that Dr. Koons's testimony at the cross-examination, we have Alex Calhoun's affidavit that contradicts that, and his testimony at the evidentiary hearing that contradicts that. He says that Koons bettered him on cross-examination. It floundered, and he decided to discontinue it. He admitted that he failed to impeach Dr. Koons on the basis of a case with similar facts, where Dr. Koons said that the argument, I'm sorry, Dr. Cunningham did attack Dr. Koons' testimony, but the prosecutor repeatedly attacked Dr. Cunningham's testimony, claiming he's not impartial. He distorted it. He used blatant false reasoning to discredit Dr. Cunningham and spurious appeals to common sense, and he urged the jury to ignore statistics. So we're saying that in taking this as a whole, this is unacceptably, unconstitutionally unreliable, and the AEDPA argument is it did violate 2254D2, an unreasonable determination of the fact. So basically that's our argument, that if you look at the facts on which the CCA held this to be harmless error, those facts don't add up when we look at the record. If the court doesn't have any further questions, I would like to get to Mr. Russell. First of all, the Merillat claim is not procedurally barred. On direct appeal, Merillat's testimony was challenged on the basis of irrelevance, hearsay confrontation clause, and heightened reliability requirements. In state habeas, the CCA held that the due process part of the claim was procedurally barred for failure to raise it on direct appeal, which is wrong. It could not have been raised on direct appeal because due process claim depended on much extra record evidence and exhibits that could not be presented on appeal. The Federal District Court held that Claim 8D was procedurally barred, but there was no Claim 8D. It was a holistic claim. It was not subdivided into subclaims like the other claims were. So the claims were clearly erroneous, and the errors stem from subdividing the claim and the erroneous CCA holding that the claim should have been brought on direct appeal when it could not because it relied on extra record evidence. The claim itself, the state has not disputed that Merillat's testimony is false. He made up this incredible, horrific story about prison violence, that has been totally discredited by us. He said that he testified falsely about capital murderers sharing cells with offenders convicted of less serious crimes, which is false. He said that if Coble goes in as a G3, he can be housed with G2, which is false. He testified falsely that he could be moved down to a G2 in 10 years from a G3, which is false. And he said that administrative segregation has to be earned through violence, which is false. We've shown extensively that his, what the prosecutor called his one great example of underreporting of prison violence, the Telford Unit story, was a fabricated perjury. There's one thing I would like to bring to the Court's attention. The state may argue that the affidavit of Hubbard's attorney, Mr. Fellows, is, this Court can't consider that, because it was not brought in the state courts. It was brought in federal courts. We do not have to worry here in Merillat's claim about a pinholster problem of not being able to, pinholster says federal courts can't look at any evidence that was not presented in the state courts. We don't have that problem here, because pinholster does not apply to cases not adjudicated on the merits. And that's, the site for that is Escamilla versus Stevens, 749 Fed 3rd, 380 at 395. That's a Fifth Circuit case, 2014. So this is not, this case was not adjudicated on the merits. That means it does not apply. That means there's no deference to the state court holdings on this case, because it was not adjudicated on the merits. And then basically 2254D does not apply. So basically we have Merillat testifying here. The, I don't know if I need to go into the instances, the details of the case, but we've thoroughly shown that they were wrong. It's not just details of the horror story. The whole thing was basically a fabrication. He lied and a death sentence cannot rely on this lie. It was presented, the cases, the details of the case were presented in both the state court petition and the district court petition. As I say, with the exception of the affidavit by Merillat, it has to be attributed to the state because he was acting as a state agent. The director has posed some cases that say that in the Fifth Circuit the unknowing use of perjury is not cause for reversal. But what we have suggested here is that, well it's pretty clear, we don't need to suggest it, but Merillat was clearly a part of the prosecution team and his perjury should be attributed to the trial prosecutor because he's working as a special prosecution unit in Huntsville. He prosecutes crimes on behalf of the local DAs. He said himself, we're like a DA's office in ourselves. Reference for that is ROA 12641. And basically he prosecutes crimes. He's acting as an investigator here. So his perjury, it doesn't matter that, we're not saying that the trial prosecutor had to know about this. Merillat may have made it up on the stand. We don't know that. But we do know that because he was acting as a state agent, that this perjury has to be attributed to the state here. So that's the, that's just our argument. As for prejudice, I think it's very important that he gave the false impression here that Coble could be housed with lesser offenders and that could go to a less restrictive status in 10 years. He prejudiced the jury by telling them that the more restrictive administrative segregation could only be earned by violent acts. That's not true. The Telford unit horror story, the one instance of prison violence allowed was designed to appeal to the jurors emotions, lies about starvation, gang membership, prolonged torture, strong inmates preying on weak ones. That was not the case here. Merillat's testimony was almost 80 pages in the reporter's transcript, and both he and Dr. Coons were the major state's witnesses. He was the last witness before the state, before the jury deliberated. The prosecutor repeatedly mentioned Merillat's testimony in the final argument. Merillat did not educate the jury about classifications and safety policies, but instead misled them. And I think that all of the standards for assessing harmless error weigh in favor of Coble, that the director has cited, Delaware v. Van Arsdale, the importance of the evidence, whether it was cumulative of other evidence, the presence of corroborating evidence, and the overall strength of the case, the state's case. You said the prosecutor mentioned Merillat's argument in closing evidence. Did the cross-examination establish that his story was false? No, not at trial. They didn't know it, Your Honor. It was presented, it was found out later. So they had no way to find out that it was false. That's another reason why there's no, there's no bar on any evidence here in this claim, the Merillat claim, because it was not adjudicated on the merits, any evidence not presented in the state courts can be considered by this Court. I would argue that the Coons and Merillat errors must be considered collectively, not item by item. And we also know that similar errors by Mr. Merillat have led to reversals of capital sentences in two cases, Estrada and Velez. And what he testified to here was much more than Estrada and Velez, which caused two capital case reversals. He testified to this fabricated prison horror story, which was not presented in Velez. I would also like to note that this Court will not be concerned with future testimony by Mr. Merillat. He's been thoroughly discredited with these reversals. So we have here two, two pieces of Dr. Coons-like testimony and Merillat-like testimony. Merillat's totally discredited. He cannot come up again, and neither can Dr. Coons, under the ruling of the Court of Criminal Appeals. So this is not setting any precedent here. And in the time I have left, getting back to Dr. Coons, as I said here, this Court does not have to overrule barefoot or establish a rule that this type of testimony is never acceptable. We're saying that these factors here, in this case, they were very unique. Nothing violent happened in 18 years. He had no notes. He had no methodology. He hadn't even read the articles on his own specialty. This is fairly unique. And the Eighth Amendment requires a fair trial. And both these claims are based on the Eighth Amendment fair trial and Eighth Amendment requirement of individualization of punishment, and the Fourteenth Amendment due process. So with those in mind, I think I would respectfully ask the Court to grant relief on these claims, Your Honor. All right. Thank you, Mr. Merillat. All right. Mr. Hoffman for the government. State rather, I'm sorry. Stephen Hoffman for the Director. May it please the Court. Mr. Kobol killed three members of his wife's family and likely would have killed his ex-wife if she hadn't fought him off. During the commission of the crime, he expressed regret that he hadn't killed his wife's three daughters and nephew when he had the chance and molested several young girls, including his own relatives. These facts are relevant to Kobol's claim that admissions of the testimonies of Dr. Richard Koons and A.P. Merillat violated his constitutional rights. However, Kobol fails to show that the state court unreasonably applied clearly established federal law in denying relief. And even if there was error, these egregious facts show that Kobol cannot prevail on any claim subject to a harm, prejudice, or materiality analysis. In his first issue, decided on the merits. Opposing counsel is saying it was not decided on the merits, so the affidavit would be admissible. Is that correct? The Dr. Koons claim was decided on the merits on direct appeal. The affidavit was not raised until federal habeas proceedings, so it could not be considered under a pinholster. Could not be. Could not be. Contrary to what opposing counsel represented. Yes, Your Honor. Why did you call Dr. Koons again? Did you know he was unreliable? Not you, but whomever. Dr. Koons has been repeatedly found, his testimony has repeatedly been found admissible in cases. He testified that he had testified in over 30 other cases. This court found his testimony was a federal death penalty case. When was that? I don't think I have the date on that one. On federal habeas review, the district court, citing this court's holding in Tigner v. Cockrell, found that the CCA's barefoot decision was reasonable. The court further found there was no relief for state evidentiary error, and in any event, the court noted that any error in admitting Dr. Koons' testimony was harmless. Today, Mr. Kobol has abandoned his argument that the Supreme Court's bareholding has modified barefoot. Instead, he simply contends that he is not relying on a categorical ban on psychiatric testimony concerning future dangerousness, but instead that the admission of Dr. Koons' testimony in this particular case violated his Eighth Amendment right to heightened reliability and capital sentencing. But we would suggest this puts the cart before the horse. If there's no constitutional error, then there is no need for harm analysis. If barefoot is applicable, then there is no constitutional error here. Kobol's cited case law simply does not demonstrate that his Eighth Amendment rights were violated by Dr. Koons' testimony. The ADEPA precludes a federal habeas petitioner from obtaining relief from a state court judgment unless that decision was contrary to or involved in unreasonable application of clearly established federal law. None of the Supreme Court cases cited by Kobol preclude expert future dangerousness testimony. For instance, in Lockett, the Supreme Court found that the Ohio death penalty statute did not permit the judge to make an individualized consideration of mitigating factors. In Gardner, the Supreme Court found that a petitioner was denied due process when a death sentence was imposed on the basis of confidential information in a pre-sentence report not disclosed to the public. It is permissible to rest the death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of a death sentence rests elsewhere. Okay, slow down a little bit. You're reading rather than talking to us. My apologies, Your Honor. It's clear you know the information, so just back off, slow down, and talk to us. You don't have to read it, but you keep speeding up, speeding up. So just on the point, just talk to us. My apologies, Your Honor. I'll try to slow down. Kobol contends that one can derive a generalized principle from these cases that a petitioner is entitled to heightened reliability in capital sentencing, thereby satisfying ADEPA and evading Teague, but a generalized principle is not sufficient under ADEPA. If the Supreme Court has not broken sufficient legal ground to establish a principle, the lower federal courts cannot establish it themselves under ADEPA. The clearly established law on the specific subject of expert future dangerousness is Barefoot, which the CCA applied in this case. And Kobol's argument is just a rehash of the arguments made by the dissents in Barefoot, which cited Lockett and other Eighth Amendment cases. The majority believe that the rules of evidence, cross-examination, the presentation of contrary evidence, and in general the adversarial system were sufficient to guard against unreliable testimony. And that's exactly what happened in this case. The CCA found that the testimony shouldn't have been admitted under state evidentiary rules, but that any error was harmless. Additionally, as the CCA observed, this court recognized in fields, when the Supreme Court talks about reliability in capital sentencing, it's not talking about the reliability of a particular piece of evidence or a witness's testimony. What it's talking about is, did the defendant receive individualized sentencing? Did the jury have the ability to consider mitigating and aggravating factors and turn its consideration into a sentence? In any event, the district court found that Kobol failed to show error or harm under Brecht, which requires a substantial and injurious effect on the verdicts. In addition to the horrendous facts of the crime, which are sufficient under CCA precedent to establish future dangerousness, Kobol has a history of child molestation and violence towards women. This court noted the same facts in its opinion granting COA. It noted that Kobol would hit his first wife. An assault charge was filed against her after he threw a baseball at her. He hit his second wife. He threw a sledgehammer at her. He would hurt her dog. His first wife's sister, who was seven years younger, was touched inappropriately by Kobol. He washed her shower. He busted her lip. He touched a 13-year-old neighbor. He touched another neighbor at his house, and then again when she started working for the drive-in movie theater that he managed. When the niece was 15, he spread her legs and made a lewd gesture. Later, he tried to kiss her and threw $5 at her. He also peeked in at her while she was dressing. He offered a 16-year-old cousin a job at his drive-in and then raped her. And while the majority of his violence was directed at women, there was still evidence that he could be violent towards men. Kobol's first wife testified that he attacked a man at work with a hammer and tried to kill him. Kobol's ex-wife, Karen, testified that he had repeatedly almost gotten into fights with other men after minor quibbles. And the CCA noted that several other factors mitigated against the finding of harm. For instance, the very strong cross-examination of Dr. Coons by co-counsel Calhoun, the rebuttal by Dr. Cunningham, and similar testimony was admitted through Dr. Hodges' 1964 report. And while my opponent notes that this is an old report made when Kobol was a teenager, it's also a report that was made by a disinterested witness, you know, a witness that was not brought in after Kobol committed his crime. So the CCA, when it made its harm analysis, was evaluating the harm under state evidentiary law. It did not conduct a harm review of the constitutional claim because there is no constitutional error here. Under barefoot, this testimony is permissible. But under 2254E1, a determination of a factual issue made by a state court is presumed correct unless the petitioner can rebut it with clear and convincing evidence. And there's just no way that one can show that an individual who is a child molester who has killed three people, there's no clear and convincing evidence that this finding of no harm was incorrect. To sum up the Dr. Coon's claim, although the CCA admittedly found that the testimony was erroneously admitted under state law, the relevant Supreme Court precedent shows there's no constitutional problem with the testimony. The state court's decision was a reasonable interpretation of federal law, and the federal court correctly found that relief is precluded under the ADEPA. And even if there was some constitutional error, the CCA correctly found there was no harm, a finding which this court would duplicate under Brecht. Turning to the Marillot claim, Mr. Marillot, was it? Your Honor, I'm opposing counsel's arguing that it was erroneous to ignore the, quote, good behavior during incarceration, that that was not given adequate evidentiary value. What's your minimize that fact? And I don't want to minimize it either. And the CCA recognized that he did not have any reports of bad behavior for the 18 years that he was in prison. However, the facts of the crime are sufficiently egregious to support a finding of future dangerousness. Also, there was evidence that he had been violent towards women and children up until he committed the instant crime. And also, I believe the CCA noted in its opinion that the jury is not required to only consider Mr. Koble's future behavior in prison, but they can consider what his future behavior would be in the free world as well. Under the law, in effect, at the time of Mr. Koble's offense, I believe the state's brief noted he would have been eligible for release after 15 years. Turning to the second claim, Mr. Merillat was a member of the Special Prosecution Unit in Huntsville, an independent agency that investigates and prosecutes crime in prison. In Mr. Koble's case, he generally testified concerning TDCJ classification and violence in prison. On direct appeal, Mr. Koble claimed that Mr. Merillat's testimony was inadmissible under the TDCJ classification. Texas Rule of Evidence 702, inadmissible as hearsay and as a violation of the Confrontation Clause, and inadmissible under the Eighth Amendment's heightened reliability standard for capital cases. The CCA found no authority existed for increasing admissibility requirements due to heightened reliability. And on the contrary, the CCA noted that some courts have suggested that evidentiary rules don't apply with full force in capital sentencing and cited to this Court's holding in fields. On federal habeas review, the District Court held there was no relief for state liars and no Confrontation Clause error. The District Court further held even if there was some error, it was harmless. In his COA application, Koble contended that his rights were violated by the admission of Merillat's testimony, and in his section dealing with Merillat, Koble cited NAPU and not much else. And NAPU provides relief when the prosecution knowingly uses materially false testimony. The Director, accepting Koble's arguments as he presented them, contended that the NAPU claim was unexhausted and procedurally defaulted. The Director also claimed that the NAPU argument was waived based on this Court's holding in Goodrum and Johnson v. Puckett because claims raised for the first time on appeal are waived. In his subsequent briefing, Koble has contended he's not raising a NAPU claim, but instead another Eighth Amendment claim based on materially inaccurate testimony and cites to cases like Johnson v. Mississippi. And he concedes he cannot prevail on a NAPU claim because he cannot prove that the prosecution was aware of the falsity. In his recent 28J letter, he appears to be contending that Mr. Merillat's knowledge can be imputed to the prosecution's team. However, it's clear in this case that Mr. Merillat was not a member of the prosecution. He works for the Special Prosecution Unit, and that unit did not prosecute Mr. Koble. And I think this Court's precedent makes clear that imputation is evaluated on a case-by-case basis, and simply testifying as an expert. The prosecution put him on the stand, though, didn't it? That is true, but simply because a witness is put on the stand by the State, it does not mean that the witness is a member of the prosecution team. Well, he's certainly not a member of the defense team. That's certainly true. But I would note in this Court's precedent in Avila v. Quarterman, the Court found that presenting an expert witness did not make that witness a member of the prosecution team. This is a case-by-case evaluation. I don't think Mr. Merillat really knew anything at all about Mr. Koble's case, and certainly didn't investigate it. He was put on to testify about classification and also about violence in prisons. Why did he make up that story? Oh, I'm sorry. No, go ahead. Excuse me? Why did he make up the story about the dead prisoner in the cell? Well, Your Honor, with regard to the story, it's worth noting that there are no findings from the Court of Criminal Appeals or the district court on this story. And the reason for that is because Mr. Koble presented his underlying evidence in a procedurally improper way. He presented some of his evidence in state habeas, at which point— There was other stuff in all that we had to read that pretty much said and determined that it was fabricated. So putting aside what you're saying now about what he didn't show, that doesn't seem to address Judge Clement's question. Even assuming, Your Honors, looked past the procedural problems, even based on Mr. Koble's own evidence, I don't think he's demonstrated any falsity. If you're talking about the Telford story, this is the story that Marylotte related to the jury where one inmate abused and killed his cellmate. I don't think Mr. Koble disputes that the inmate perpetrator killed his cellmate. In fact, according to his own information, the Court of Appeals opinion that he submitted,  the Court of Appeals overturned that and sent it back down. But Mr. Koble's affidavit from the inmate perpetrator's attorney suggests that he later pled guilty to manslaughter. So at the end of the day, the perpetrator inmate did kill the other inmates. The story was not false? He disputes certain particulars about the story, but— You made it sort of dramatic saying that his body was in there for an extant amount of time before it was found. Is that not true? Well, as I noted, we don't have any findings from the CCA or the district court. The lawyer who represented the inmate who committed the murder filed an affidavit saying in defending his client, yeah, he did the crime, but all that stuff this guy says is not true. We're not putting you in the position of trying to vouch for it, but it seemed indisputable that at best his testimony was fabricated, embellished, et cetera, et cetera, based on the lawyer who represented the guy who did the killing, not Mr. Koble. The question was just, you say it's not part of the prosecution team, and that's not spotted in this case. But it's a little bit curious as to why the witness was put on in the first place, given the issue in this case that was sought to be tried. I mean, there's no doubt about why Dr. Coombs was put on, but this Maryland, an investigator, those of us who tried cases, it just looked like an odd piece of a witness to put on, given the parameters of what the state needed to show, given that he didn't have any of that kind of knowledge. He wasn't profited as an expert, right? Because he was an investigator. And so what was the probative worth of the prison conditions and that kind of thing that he was able to testify? What was the probative worth of that for the prosecution's case? Well, Your Honor, I would have a couple of responses to that. First, the CCA found that he was qualified as an educator expert in its opinion. Two, the information that Mr. Koble relies upon comes from the perpetrator inmate's defense attorney and also the court of appeals opinion. And the court of appeals opinion was evaluating whether a necessity instruction was called for based on the inmate's testimony. Obviously, the perpetrator inmate and his defense attorney will have a very different perspective on events than Mr. Merillat, who is a member of the prosecution team investigating that case. As best I can tell, you're not answering the question I asked you. You're obviously bright, but it does help if you answer the question asked, not the one you preferred that I asked. All I asked you was, in this capital case, you know, with the issues about future dangers that the jury has to find, from a perspective of the clemency trial judge or I, if you put this witness and said, I'm going to call Merillat, we say, what's he going to testify to? One of us might say, after you told us what he did, I'm not letting you put him on. And all I asked you was, what was the purpose? You've said you don't want to claim him as part of the prosecution team. I'm not trying to make you do that. I'm just trying to understand what was his purpose in the framework of what the prosecution was trying to show, since he was not an expert witness. I didn't say he was a witness that didn't have facts, but what was it sought to show in connection with this phase of the trial? It didn't seem like he had any knowledge about it. That's what I'm asking a relevancy question. Right. So Mr. Merillat was called as a rebuttal witness to Dr. Cunningham. Dr. Cunningham talked about COBOL's potential for future dangerousness based on statistics. And Mr. Merillat was called to show that those statistics were frequently unreliable due the under-reporting of violence in prison. According to Mr. Merillat, many crimes in prison are not reported for a variety of reasons. For instance, the violence that occurs might not meet the penal definition of violence, or inmates may not report it because they don't want to be labeled a snitch, or perhaps the warden feels like the matter can be dealt with informally or internally. And that was the purpose of Mr. Merillat's testimony. He was there to rebut Dr. Cunningham's statistical analysis by showing that those underlying statistics were not correct. Which would not have required him to fabricate the story. I get you. Thank you. That was responsive. Thank you. We would maintain that Mr. COBOL has not demonstrated that the story was actually false. And concerning the other pieces of evidence that Mr. COBOL contends have been fabricated, for instance, concerning Mr. Merillat's testimony that assignment to administrative segregation is something that one earns through bad acts, COBOL says that the TDCJ can assign an individual to administrative segregation based on previous incidents of escape, hostage taking, and staff assaults. But the fact that an individual can be assigned to segregation based on these acts does not seem to undermine Mr. Merillat's testimony that you have to earn segregation through misbehavior. Also, he doesn't show that Mr. COBOL had any of these negative designations, meaning that the relevance here is tenuous. Regarding COBOL's claim that Merillat falsely testified that G2 and G3 offenders can live together, his own briefing admits that these offenders can live together in certain exceptional circumstances. COBOL referred to the CCA's opinions in Estrada and Velez as examples of cases that have been reversed based on Merillat's testimony. But the error alleged in this case is different than the error that the CCA granted relief on in Estrada and Velez. In Estrada, the CCA explained that offenders are classified G to G5, least restrictive to most. In Estrada and Velez, Merillat testified that a capital offender sentenced to life without parole could theoretically drop below a G3 classification, but he was unaware of a TDCJ regulation that would prevent that from happening. It was a new regulation. But that's not the error that's being alleged here. And moreover, those are cases that were litigated on direct appeal where the CCA was exercising its supervisory authority over the trial court, not federal habeas cases. The district court found there was no harm associated with Mr. Merillat's testimony. This is supported by the record. Mr. Merillat only rebutted Dr. Cunningham. He sought to educate the jury about classification and what I think is an uncontroversial proposition that violence occurs in prison and it's underreported. He also admitted he wasn't qualified to opine on COBOL's future dangerousness. He acknowledged it was up to Mr. COBOL to decide to be good or bad. And then, as with Dr. Kuhn's claim, there is COBOL's history of violence, which far outweighs any prejudicial effect from Mr. Merillat's testimony, even assuming that it was false. In short, the CCA's decision, based on the record before it that Merillat's testimony did not violate the Eighth Amendment, was reasonable under ADEPA. And even if there was some error associated with Mr. Merillat's testimony, the district court correctly found it was harmless under Brecht. If your honors have no further questions, COBOL has failed to show any constitutional error occurred in this case, let alone that the CCA unreasonably applied clearly established federal law in denying relief. Moreover, ample evidence showed that COBOL is a multiple murderer and a child molester. The jury's decision to impose the death penalty in this case was largely inevitable. And any error in the admission of these testimonies was plainly harmless. Thus, the director would ask that the district court's opinion denying relief be affirmed. Thank you. All right. Back to you, Mr. Ellis, if you have rebuttal. Thank you, Your Honor. First of all, I would like to address counsel's argument on United States versus fields. Fields involved the Federal Death Penalty Act, which is certainly not what we're looking at here today. Secondly, the argument was that COBOL has abandoned the barefoot argument. That's not true, Your Honor. We still say that barefoot never said that categorically these predictions are always admissible. Barefoot said that in the circumstances of barefoot, they were okay. So what we have here, barefoot is a, as I said before, we don't, this court does not have to overrule or say that barefoot is wrong here. Our fallback position is that in this case, the circumstances were particularly unreliable such that it was unconstitutionally unreliable for Dr. Koontz to testify. There's a whole slew of cases that say that the sentencing procedures have to be reliable. Lockett versus Ohio, a greater degree of reliability with death sentences. Gardner versus Florida, penalty phase evidence must be based on reason rather than caprice or emotion. Caldwell versus Mississippi, sentencing processes should facilitate responsible and reliable exercise of discretion. And Ford versus Wainwright, capital fact-finding procedures aspire to a higher standard of reliability. And then we had last year the Supreme Court's decision in Buck versus Davis, which held unreliable future dangerousness predictions based on race. That's unscientific and that's unreliable. That's what the Supreme Court said. Next, I would like to go on to counsel's argument that there's no, well, I've covered the, this is the constitutional problem. The constitutional authority here is Lockett, Gardner, Caldwell, Ford, Buck, all of these cases that say that the sentencing procedures have to be reliable. Next, counsel suggested that, or the question was asked by the court, was the good behavior ever minimized? And it was minimized dramatically by Dr. Koontz's testimony that everyone on death row is on good behavior. So therefore, Billy Koval's 18 years of good behavior on death row doesn't count for anything. This is extremely prejudicial. This leads the jury to believe that it just does not count for anything. And I can't see the state policy in wanting to do this. It would discourage the other inmates who are supposedly always on good behavior because their cases are on appeal. So the state at Koval's trial did minimize Koval's good behavior on death row by saying that everyone does it on death row. Everyone's on good behavior. So therefore, you shouldn't count it heavily. Next, I would like to get to the point that this, is this a Napieu case? Well, Napieu is cited, but we're saying that this is, this does not depend on Napieu. This is one of several cases that we're depending on. Giglio, for instance, is maybe even more in point where it says that behavior can be attributed, behavior that the trial prosecutor doesn't know about can be attributed to the prosecutor if a person on the team knew about it. And that leads to the other argument that Merillat was not a part of the prosecutorial team, which is dramatically contradicted by the record. Merillat worked for the Special Prosecution Unit in Huntsville. He said, on the stand, he said, we're like a DA's office in ourselves, ROA 12641. He said that they will prosecute these crimes on behalf of the local district attorneys. They brought us together as a unit to prosecute these crimes on behalf of local DAs. We're invited in by the DA, 12641 to 12642. Our prosecutors act as assistant DAs and take the cases from the grand jury all the way through the appellate process as far as the DA wants us to go, 12642. His office has prosecuted over 20,000 felony cases. He says he takes the cases to the grand juries. He, Merillat testifies, we've taken condemned inmates to trials in district courts across the state. And he, quote, he said, each of us investigators work for a particular prosecutor in our office. And that's at ROA 12643. If they're indicted, he says, we'll move forward with the prosecution of the case and get ready for a trial in district courts across the state. End quote. I work for the prosecutor, and I work the trial with my prosecutor in the courtroom, coordinate witnesses, and such as that. And that's at 12643. His duties are very similar to a DA investigator's. That's what he said at 12643. I'm jealous you're on a roll, but you've got a red light. Thank you. I appreciate it. How old is Mr. Coble now? He is 69, Your Honor. Is he in a regular population, or is he in some special setting? He is taking medications. He's had a heart attack. He's on heart medication. His health is even worse than it was at the trial 10 years ago. So he is 69. He will be 70 this year. All right. You're court appointed, right? Yes, I am. You have been. You've got a lot of air miles on this case, that's for sure. Not to understate the importance, but your role as appointed counsel in this capital case is greatly appreciated, not only by the judges of our court, but by all of us. They're tough, difficult cases, to put it mildly. And the fact that you've stayed on the case as long as you have is to be admired and represents well the entire system. So we thank you. And I appreciate the honor of being offered oral argument here in this case. Thank you. Mr. Hoffman, we appreciate your advocacy and briefing here today. The case will be submitted and we'll decide it. Thank you.